## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION



| | | |
|---|---|---|
| UNITED STATES ex rel. | § | United States Courts<br>Southern District of Texas<br>F I L E D<br><br>SEP 18 2019<br><br>David J. Bradley, Clerk of Court |
| J. MICHAEL ARTIGUE AND | § | |
| CHAD ZERANGUE, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:18-cv-2398 |
| | § | SEALED |
| NATIONAL NEUROMONITORING | § | |
| SERVICES, LLC and MEDICAL | § | |
| DIAGNOSTICS MANAGEMENT | § | |
| SERVICES, LLC D/B/A | § | |
| MD MANAGEMENT | § | |
| | § | |
| **Defendant.** | § | **DEMAND FOR JURY TRIAL** |

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

## REDACTED ORIGINAL COMPLAINT

Plaintiffs and qui tam Relators J. Michael Artigue and Chad Zerangue file this Redacted Original Complaint on behalf of the United States. Plaintiffs and Relators bring claims pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-30 for false claims as well as for violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) and Stark Law, 42 U.S.C. § 1395nn constituting predicate acts for FCA violations. Plaintiffs and Relators respectfully show the following:

**I.      Parties**

1.      Plaintiff and Relator J. Michael Artigue ("Artigue") is an individual and resident of Louisiana with address 119 Girard Woods, Lafayette, Louisiana 70503. Artigue is the compliance officer and Corporate Counsel for Simplicity Health Systems LLC ("Simplicity"), a Texas Limited Liability Company with mailing address P.O. Box 92856, Southlake, Texas 76092. Artigue is a member of Simplicity.

2.     Plaintiff Chad Zerangue ("Zerangue") is an individual and resident of Texas with address 1205 Robin Drive, Keller, Texas 76262. Zerangue is the President and managing member of Simplicity.

3.     Defendant National Neuromonitoring Services, LLC ("NNS") is a Texas limited liability company with its principal place of business at 3502 Paesanos Parkway, Suite 100, San Antonio (Shavano Park), Texas 78231. NNS also conducts business operations from an office located at 5080 Spectrum Dr., Addison, Texas 75001. Scott Laroque ("Laroque") is the Chief Executive Officer/managing member of Defendant NNS. Alla Kosova-Laroque ("Kosova") is the spouse or significant other of Laroque and assists him in managing NNS and/or Medical Diagnostics Management Services, LLC. NNS also uses approximately 48 captive or subsidiary entities to help disguise its actions. *See* Ex. 1.[1]

4.     Defendant Medical Diagnostics Management Services, LLC ("MDMS") d/b/a MD Management Services is a Texas limited liability company with its principal place of business immediately next door to NNS, at 3502 Paesanos Parkway, Suite 200, San Antonio (Shavano Park), Texas 78231. MDMS is an NNS affiliate, or an in-house "arm" of NNS, which NNS employs for book and record-keeping, billing, collecting fees and like functions. MDMS and/or NNS also uses approximately 6 other captive or subsidiary entities to disguise its billing services. *See* Ex. 2. Laroque is the President of Medical Diagnostics Management Services. NNS also uses a post office address for MDMS and other NNS owned or controlled companies, P.O. Box 592442, San Antonio, Texas 78259. As part of the scheme alleged herein, Medical Diagnostic Management Services, LLC and NNS also use or maintain mailbox facilities located, *e.g.,* at a UPS Store located at 1141 N. Loop E. # 105, San Antonio, Texas 78232. *See* Ex. 3.

---

[1] The unredacted Original Complaint, and attachments, appendices or exhibits to the unredacted Original Complaint have previously been filed under seal and served on the Government in accordance with 31 U.S.C. § 3730(b)(2).

## II.     Jurisdiction and venue

5.     The Court has jurisdiction over this action under 28 U.S.C. § 1331. Venue is proper in this District under 31 U.S.C. § 3732 and/or 28 U.S.C. § 1391.

## III.    Background

### A.     Simplicity Heath Systems

6.     Simplicity is a medical software company engaged in the business of developing and providing enterprise level platforms complying with the Health Insurance Portability and Accountability Act of 1996[2] ("HIPAA"). These software platforms allow healthcare organizations to smoothly exchange data with other healthcare or health record organizations and/or databases. Using Simplicity software, healthcare organizations can easily share with one another, *e.g.,* patient information, Accountable Care Organizations ("ACO") data, population health data, and other healthcare or health service information. In addition – when healthcare organizations need to extract specific information from a collective data source or multiple data sources – the Simplicity software can locate the relevant data or information, sift between more relevant and less relevant data, apply identified data or information to multiple queries or scenarios, and generate reports containing detailed responses to the user's queries. The Simplicity software thus allows most functions needed to run or manage a complex healthcare enterprise to be available on a single platform and at a single point of operation.

7.     In 2015, Defendant NNS engaged Simplicity for its knowledge of handling Electronic Health Records and also for Simplicity's ability to provide client-specific business solutions with its software. As a result of this engagement, Simplicity members Artigue and Zerangue obtained unique, direct and independent knowledge of the information forming the

---

[2] 42 U.S.C. § 1320, *et seq.*; 45 C.F.R. Part 162.

**UNDER SEAL**

allegations in this Complaint. Artigue and Zerangue file this Complaint under seal and have served it on the government. Artigue and Zerangue have also voluntarily provided the government with substantially all the material information and evidence that supports the allegations herein. Because the allegations in this Complaint result from Artigue's and Zerangue's unique access to the development and operation of software used to run NNS' business, these allegations have not been publicly disclosed. Alternatively, to the extent any allegations have been publicly disclosed, Artigue and Zerangue have knowledge of the false claims made to the government that is independent of, and materially adds to, publicly disclosed allegations and/or transactions.

**B.** **Industry background**

8.  In industry parlance, a Practice Management ("PM") system is a healthcare software system used to manage the day-to-day operations of a medical practice. PMs can allow users to, *e.g.,* capture patient demographics, schedule appointments, maintain lists of insurance or governmental payers, perform billing tasks and generate business reports.

9.  An Electronic Medical Record ("EMR") is a digital version of a paper chart showing a patient's medical history, as recorded by a medical practice or facility. EMRs are used by healthcare providers in the diagnosis and treatment of patients.

10.  An Electronic Health Record ("EHR") is a systemized collection or population of patient health information recorded in a digital format. EHRs may include a range of data, such as demographics, medical histories, medications, allergies, immunization records or status, laboratory test results, radiology records, vital sign records, personal statistics such as age or weight, and/or billing information. An EMR is typically just one part of an EHR; EHRs contain

both EMRs and information collected by a PM system.[3]

11.    "Neuromonitoring" (also known as neural-monitoring) is intra-operative neuro-physiological monitoring.    An intra-operative neuromonitoring ("IONM") machine uses electronic devices to monitor neural structures, *e.g.,* nerves, the spinal cord or portions of the brain, during surgical procedures.    A trained technologist or technician facilitates neuromonitoring by placing sensors with adhesive patches on the human body.    The IONM machine then "reads" electrical impulses that pass between these monitoring sites.    In addition, a physician (other than the surgeon performing the procedure) will monitor or interpret the signal or information generated by the IONM machine as a procedure is in progress.    The purpose of neuromonitoring is not only to reduce risks of neural damage, but also to provide functional guidance to surgeons or anesthesiologists during surgery.    For example, in a spinal procedure where a screw may be installed into bone, if the screw goes slightly too far and impinges on a neural structure, the sensors would detect the impingement and indicate to the surgeon to reverse the screw until the impingement is eliminated.    IONM is not a mandatory part of all surgeries, and use of IONM is typically at the discretion of the operating surgeon.

### C.    Increased use of EHRs after HITECH Act

12.    In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health ("HITECH") Act as part of a $35 billion legislative initiative intended to transform delivery of healthcare services through, among other things, increased use of EMRs. HITECH created incentives for companies to enter the market for creating, recording and transmitting EHRs and related services.    Today, a number of companies compete in the EHR market – including the market for neuromonitoring services.    Also, certain EHR systems have

---

[3]  Healthcare providers typically use the term "clinical data" to refer to medical data collected during on-going patient care or as part of a clinical trial.  "Administrative data" typically refers to data from the business or management functions performed at a healthcare provider.

become thought of as systems of choice in various healthcare sectors. For example, in the neuromonitoring sector, U.S. Monitoring, Inc. ("USMON") is often perceived as an EHR system of choice.

**D.     Relators' development of the custom software solutions for NNS**

13.     NNS engages in the business of providing neuromonitoring services for surgical procedures. Up until 2015, NNS relied primarily upon an EHR system from USMON to conduct its business. The USMON system was originally developed to serve one principal purpose – collecting and recording point-of-care data which neuromonitoring equipment generated during surgery. Though appropriate for this purpose, the USMON system was not designed to be used as an "enterprise software" platform. That is, USMON was not designed to function as a system meeting broader business needs (*e.g.,* administrative, billing and collections functions) for a complex healthcare organization. In particular, the USMON system was not capable of assisting NNS in recording, billing and collecting fees for neuromonitoring services that NNS provided.

14.     In December of 2014, Artigue and Zerangue were introduced to Laroque and Alla Kosova, who represented themselves as owners of NNS. A sales and presentation process ensued, so that Artigue and Zerangue met with Laroque and Kosova and demonstrated Simplicity software's ability to use data from a USMON system to assist NNS in its billing analyses, business financial reporting and other business functions.

15.     NNS hired Simplicity on or about January 26, 2015, to develop a software interface that NNS could use to link into available USMON data and extract information which could then be converted or translated into business or management records and reports. Over the following two years, Simplicity's work for NNS grew in scope as NNS requested that additional functions and features be added to the software platform. In August 2016, NNS CEO Laroque

requested that Zerangue develop a platform that could completely replace its USMON system, while also providing NNS with numerous business-facilitating functions unavailable in other software products.

16.     Simplicity personnel, including both Artigue and Zerangue, accordingly developed a unique enterprise software system for NNS (while continuing to deliver for NNS mission-critical health care reporting and business-office reports from its proprietary Simplicity software system). The Simplicity system allowed the single-purpose systems (such as USMON) used by neuromonitoring companies to communicate seamlessly with other software systems and databases, so that multiple systems or databases could function as a single, unified system in answering complex or compound queries. The Simplicity system also allowed NNS' various administrative, business and clinical functions to all communicate and function together within a single platform.

17.     Two proprietary components form the core structure of the Simplicity system – the Data Warehouse and the Document Manager. The Data Warehouse stores information – both in the form of document images (such as pdf scans of documents, tables and charts or, *e.g.,* faxes, bank statements or statements of account), as well as in the form of letters, words or numbers. Also, anything that is typed, written or scanned into another software system which is linked to the Simplicity system could also be stored or accessed through the Data Warehouse. For example, information included here in the Appendices was stored in the Data Warehouse.

18.     In comparison, the Document Manager allows users to distribute key information in a HIPAA compliant manner, and also gives users notice when documents or specific information are loaded into the system. The Document Manager allows the user to label incoming data, documents and information in a way that permits them to later be quickly located,

retrieved and arranged in requested configurations. The Document Manager, by applying custom-written scripts to information contained in or linked to the Data Warehouse, can generate reports or results responding to highly sophisticated queries.

19. Simplicity's ability to "marry" the Data Warehouse function with the Document Manager function was critical to the way that NNS came to manage its business in the 2015 through 2018 timeframe. Based on Relator's work for NNS, the Simplicity system is able to access and assemble NNS data, documents and information from the 2011 to mid-January 2018 timeframe. Because Artigue and Zerangue had and have access to, and know how to use, the Simplicity system developed for NNS and its data for this 2011 to 2018 timeframe, they have unique knowledge and ability to act as Relators and/or original sources in this case. As detailed herein, due to Simplicity's work for NNS while Artigue and Zerangue were members of Simplicity, Artigue and Zerangue have direct and independent knowledge of NNS' and MDMS' misconduct in submitting false claims to the government and violating the FCA.[4]

20. The "flow" of information and data through the Simplicity system is illustrated on Ex. 4,[5] which the Relators prepared. (This Exhibit also shows the flow of funds through the scheme. *Id.*) Information from the IONM machine first flows to the USMON system, a PM system and EMR records. The information and data received by these systems then flows into

---

[4] Examples of the impact of the Simplicity software system can be found in several customized reports that NNS used to grow its business, *e.g.*, the denial code report. Using Simplicity software, NNS was able to diagnose why denied claims were rejected based on a code provided by the payer. NNS would use this information to resubmit claims in ways that would get the same claim for the same procedure approved and ultimately paid. In observing NNS' use of the Simplicity system, Artigue and Zerangue came to learn that one of NNS' "tricks" for re-billing denials was to split the denied claims into several smaller claims, wait three to six months, and then resubmit all the split claims at the same time. The Simplicity system only received totaled claim information from USMON, so Zerangue and Artigue do not have claim detail data for incorrect billings on the part of NNS. But due to the rebilling "tricks" that Zerangue and Artigue heard NNS personnel boast of, Zerangue and Artigue became concerned in late 2016 and 2017 that NNS would engage in unlawful billing practices if doing so would increase the fees that NNS collected from federal healthcare programs.

[5] All exhibits and the attached Appendices are incorporated into this Complaint.

the Data Warehouse, where it is inventoried. Data and information inventoried by the Data Warehouse is then be fed into spreadsheets or "pivot tables" which NNS business analysts or staff use to "work" claims to federal healthcare programs or insurance companies for payment for neuromonitoring services. Once claims are closed or final, data and information inventoried by the Data Warehouse flows to NNS' accounting system (or to an accounting system operated by its in-house billing organization or company, Medical Diagnostic Management Services LLC, a company with offices next door to NNS in the same building at 3502 Paesanos Parkway, Suite 200, San Antonio (Shavano Park), Texas 78231). NNS then uses the Document Management function to generate different business records, *e.g.,* bills, collection records, distribution statements, *etc.*, which NNS circulates internally and/or to its affiliates.

**E.**  **Bxxxxxx's complicit relationship with NNS' fraud, and termination at Simplicity**

21.  Jxxx Bxxxxxx acted as Simplicity's Chief Technology Officer from 2010 until November of 2017. Simplicity terminated Bxxxxxx on November 16, 2017. Prior to his termination, Bxxxxxx's role at Simplicity had been to deliver projects sold by the company and to act as a consultant to solve business problems for Simplicity clients. Starting in August of 2015 and continuing until November of 2017, Bxxxxxx was the project manager and consultant responsible for the bulk of Simplicity's dealings with NNS. These dealings included matters relating to NNS' compensation of Simplicity and NNS' requests for additional software features. Laroque, Kosovo or Bxxx Mxxxxxx (NNS' Chief Financial Officer) represented NNS in the business interactions with Simplicity. Mxxxxxx's assistant Mxxxxx Pxxxxx and Bxxxxx

Txxxxx, NNS Director of Operations, was also involved.[6] Relators assert that Laroque and Kosovo control NNS and are NNS' principal owners.

22.     Bxxxxxx was instrumental in creating the reports that NNS used to send and bill thousands of claims.  Bxxxxxx's background made him particularly suited to this work, as he was trained as a business and technology consultant at a major accounting/consulting firm prior to his employment at Simplicity.

23.     In July 2017, Simplicity sought to increase fees charged to NNS because the amounts that NNS had been paying to Simplicity were inadequate to allow Simplicity to continue work that NNS had requested.  On behalf of Simplicity, Bxxxxxx conducted important aspects of these fee negotiations with NNS.  Zerangue, however, witnessed Bxxxxxx's interactions with NNS and expressed concern as Bxxxxxx's negotiations with NNS became increasingly opaque.  In particular, in August 2017, when Zerangue questioned Bxxxxxx about converting fixed-fee billing for NNS to time-and-materials billing, Bxxxxxx was evasive and provided answers which – when viewed from the perspective Simplicity's business interests and Bxxxxxx's duties to Simplicity as an officer – made little sense to Artigue and Zerangue.

24.     In October of 2017, Bxxxxxx's conduct became increasingly evasive and problematic.  In subsequently reviewing information communicated between Simplicity and NNS in November 2017, Artigue and Zerangue learned that Bxxxxxx, without consulting other members of Simplicity, had sought to solicit and structure an investment into Simplicity by Laroque, Kosovo and/or NNS.  The information that Artigue and Zerangue discovered in Bxxxxxx's communications with NNS in November 2017 showed that Bxxxxxx's and NNS' intent for the investment was to engineer Zerangue's removal as Simplicity's president and

---

[6] Earlier in the parties' relationship, Txx Dxxxxx also interacted with Simplicity on behalf of NNS.  In addition, Bxxxxx Lxxxxx, brother of xxxxx, had limited involvement in NNS' dealings with Simplicity.

**UNDER SEAL**

install Bxxxxxx (as NNS' agent or representative) into this position instead. In discussing the potential investment with Laroque, Bxxxxxx also communicated to NNS Simplicity's confidential information – including Simplicity's cash flows and the position that NNS enjoyed as Simplicity's largest client. Zerangue and Artigue also discovered that, with Bxxxxxx's knowledge and active assistance, NNS was attempting to internally construct software to copy and replace the Simplicity software system used by NNS.

25. Because Bxxxxxx's activities with Simplicity had become so suspect, Relators confronted Bxxxxxx about his management of the technology matters for Simplicity. Bxxxxxx's employment with Simplicity was subsequently terminated in November 2017 after what Simplicity viewed as repeated ethical infractions. For example, Simplicity explained in Bxxxxxx's termination letter, "Furthermore, on Wednesday, November 15, 2017, you stated to Chad Zerangue, President of Simplicity Health Systems, that you solicited investment capital from a client in an effort to buy Chad Zerangue out. In doing so, you jeopardized the reputation of Simplicity Health Systems in the eyes of the client. As a result of your unethical behavior, your Simplicity admin rights were removed. It has come to our attention, that you found a way to circumvent your admin rights in an effort to gain them back. Additionally, it has also been discovered that you possess multiple intrusion points within our technology infrastructure that we cannot control."

26. NNS ceased paying Simplicity for any services in November 2017. After he was terminated from Simplicity, Bxxxxxx immediately began working for NNS. The relationship between NNS and Simplicity continued to deteriorate and terminated completely on or about December 21, 2017.

F.    NNS' growth during Simplicity's tenure

27.     During the three-year period from late 2014 through 2017 – while engaging Simplicity and/or using software and systems that Simplicity developed – NNS grew dramatically.  During this timeframe, NNS was Simplicity's primary client.  The Relators also have direct and independent knowledge and possession of records showing that, from 2011 to January 19, 2018, NNS made roughly 86,803 claims for payment on neuromonitoring services to federal healthcare programs and private insurers.  Ex. 5.  The total value of the billings on these claims was roughly $xxxxxxxxxx.  *Id.*  Of this total, roughly 31,861 claims and $xxxxxxxxxx of the billings are attributable to claims made to federal healthcare programs or programs in which the federal government participates.  *See id.*

G.     **NNS information organized and stored using Simplicity software**

28.     In October, 2017 – prior to his termination – Bxxxxxx had expressly stated to Zerangue that the NNS data available on the Simplicity system occupied six (6) servers on the Amazon Web Services ("AWS") Cloud.  After Bxxxxxx's termination, Zerangue and another Simplicity employee took over Bxxxxxx's former responsibilities and began to inventory the NNS data and information that Bxxxxxx had stored using Simplicity facilities and/or software. Artigue and Zerangue learned that the data which Bxxxxxx handled for NNS actually occupied 21 servers.  To understand why the NNS data was stored on 21 servers – when Bxxxxxx had represented that only six were involved – Simplicity, under Zerangue's and Artigue's direction, began to examine and map the NNS data and information that Bxxxxxx had placed on the servers during NNS' engagement of Simplicity.  This information and data included, *e.g.,* NNS' corporate filings, communications, monthly billing and collection statements, associated billing information for claim submitted for patients monitored using NNS' services, *etc*.

29.     Artigue's and Zerangue's work at Simplicity, and examination of the NNS data and information that Bxxxxxx assembled while employed at Simplicity, have provided the Relators with unique, direct and independent knowledge of false claims that NNS has made to the federal government.  This is because persons with access to (and knowledge of how to use) the Simplicity system can "see" how NNS used that system to achieve astonishing growth after it first began using the Simplicity system early in 2015.  As the attached chart and graph shows, *see* Ex. 6, NNS filed 8,419 claims in 2014, 9,994 claims in 2015, 20,404 claims in 2016 and 37,362 claims in 2017.  These increases constituted a "hockey stick" upward spurt of growth during this four-year period.   The data and information on the Simplicity NNS system demonstrate a scheme by NNS to pay kickbacks to surgeons in return for obtaining patient referrals for NNS' neuromonitoring services.  NNS then makes claims to federal healthcare programs for these services.  Approximately 193 limited liability companies (LLCs[7]) ostensibly owned by surgeons are involved and used as conduits or sham companies or extensions of NNS for this fraudulent scheme. *See* App. II.

**H.      Design and implementation of the NNS scheme**

30.     Like other neuromonitoring companies, NNS was faced with the issue of a fungible product:  the neuromonitoring services offered by NNS were essentially the same as services offered by any other company.  The interchangeable nature of the services offered by NNS and those offered by its competitors presented NNS with a problem of how to differentiate itself vs. the competition – when there were no material differences in services provided by the two.  NNS accordingly devised a scheme to overcome the lack of any distinction between itself

---

[7]  Relators uses the abbreviation "LLC" to refer both to limited liability companies and to professional limited liability companies ("PLLCs").

and its competitors – and to persuade surgeons to seek neuromonitoring services from NNS rather than from other competing companies.

31.     NNS, MDMS and Laroque were aware that simply making *direct* payments to a surgeon in return for the surgeon's referring to NNS patients, or groups of patients, whose fees are paid by federal healthcare programs for neuromonitoring services would violate federal laws. So NNS hoped to disguise its unlawful scheme, and insulate it from discovery, in two principal ways. First, NNS created structures to make it appear that LLCs purportedly owned by the surgeons (but which were actually sham extensions of NNS) provided the neuromonitoring services, collected payments for the services and, ultimately, paid the surgeon an LLC "distribution" – rather than a kickback from NNS. Second, NNS attempted to make the payments to the surgeons appear as if they resulted only from referrals and neuromonitoring of *privately* insured patients – as opposed to patients whose fees were paid by federal healthcare programs. These two components of NNS' fraud are described below.

**1.     NNS' creation and use of sham, conduit LLCs**

32.     To initiate its scheme, NNS approached surgeons with a proposal that NNS would form an LLC, purportedly for the surgeon or surgeon group. The stated purpose of the LLC would be to engage in the business of providing intra-operative neuromonitoring services. The surgeon could then purport to use neuromonitoring services purportedly provided by their own neuromonitoring company or LLC in procedures where they acted as the surgeon. All the LLCs involved in NNS' scheme are created and structured using substantially the same forms of formation certificates, articles, company agreements, consents, management service agreements and like documents.

33.     Relators here refer to two LLCs as representative examples or samples of specific

fraudulent acts committed by NNS and MDMS pursuant to the fraudulent scheme – Cxxxx Mxxxxxxxx PLLC in Austin, Texas and Mxxxxxxxx PLLC in Houston, Texas. Information for ten (10) exemplar LLCs is included in attached Appendix I; this Appendix and these LLC examples are incorporated into this Complaint. Using their access to (and knowledge of how to use) the Simplicity system, Relators can locate and see the same types of information, and make the same types of allegations, for the 193 LLCs shown on Appendix II.

34. NNS' control of the formation of the surgeon's LLC can be shown, *e.g.,* as follows:

- The Certificate of Formation, file number xxxxxx626, dated xxxx xx, 2014 for Cxxxx Mxxxxxxxxx PLLC shows "Mxxxxxx Gxxxx" at "xx06 Fxxxxxxx Cxxxx, San Antonio, TX xxx29" as the registered agent for Cxxx Mxxxxxxxxxx. App. I, Tab A, item 1 at 1, 3. As a result of Simplicity's work for NNS described above, Realtors have observed that Ms. Gxxxx is the CPA and accountant for NNS. The xx06 xxxxxxxx xxxxxx, San Antonio, Texas xxx29 address is the location for the CPA firm Pxxxxxx & Gxxxx LP, where Gxxxx is or was a principal. Ex. 7. Pxxxx & Gxxxx LP was a firm engaged by NNS, as opposed to being engaged by Cxxxx Mxxxxxxxxxx.

- The Certificate of Formation, file number xxxxxx608, dated xxxxxxxx xx, 2015 for Mxxxxxxxx PLLC, shows "Hxxxxxx and Pxxxxx P.C." at "xx45 xxxx xxxxxx, Suite 2400, Dallas TX xxxxx" as the registered agent for Mxxxxxxxx. App. I, Tab B item 1 at 1, 3. As a result of Simplicity's work for NNS described above, Relators have observed that Hxxxxx & Pxxxxx were often employed by NNS, Laroque or Alla Kosova. Hxxxxx & Pxxxxxx is a firm engaged by NNS, as opposed to being engaged by Mxxxxxxxx.

- An application for an employer identification number for Austin-based Cxxxx Mxxxxxxxxx PLLC dated xxxx xx, 2014 shows Cxxx Mxxxxxxxxx's address as "P.O. Box xxxxxx, San Antonio, Texas xxx59-xxxx." App. I, Tab A, item 2 at 1, 3. This post office box is the same post office box used by NNS and its captive company Medical Management Services LLC, as well as other NNS-controlled LLCs and companies. *See* Ex. 8. This application lists NNS CEO Laroque as Cxxxx Mxxxxxxxxxx's purported third party designee. App. I, Tab A, item 2 at 3.

- An application for an employer identification number for Houston-based Mxxxxxxxx PLLC dated xxxxxxxx xx, 2015 showed Mxxxxxxxx's address as "xx41 x. xxxx 1604 x., # 105-612, San Antonio, Texas xxx59-xxxx." App. I,

Tab B, item 2 at 2. This address is for the UPS Store mailbox used by NNS. *See* Ex. 3. The application was signed by Bxxxxx Txxxxx. As a result of Simplicity's work for NNS described above, Relators have personal knowledge that Ms. Txxxxx was Director of Operations for NNS.

- The Department of Treasury letter of xxxx xx, 2014, assigning an employer identification number (EIN) to Cxxxx Mxxxxxxxxx was addressed to "Cxxxx Mxxxxxxxxxx PLLC … P.O. Box xxxxxx, San Antonio, Texas xxx59." App. I, Tab A, item 2 at 1. This post office box is the same post office box used by NNS and its captive company Medical Management Services LLC, as well as other NNS-controlled companies. *See* Ex. 8.

- An IRS electronic letter confirms that, in response to Ms. Txxxxx's application for Mxxxxxxxx, the IRS issued Mxxxxxxxx EIN xx-xxxx3908. App. I, Tab B, item 2 at 1.

35. In other words, NNS and its affiliate MDMS performed all major tasks for creating the LLC purportedly owned by the surgeon, using (1) professionals (*e.g.,* Gxxx and Hxxxxxx & Pxxxxx) engaged by NNS or MDMS – not by the surgeons, (2) addresses or mailboxes (*e.g.,* P.O. Box xxxxxx, San Antonio, Texas xxx59 and xx41 x. xxxx 1604 x., #105-612, San Antonio, Texas xxx59-xxxx) obtained and occupied by NNS or MDMS – not by the surgeons who purportedly owned the LLCs, and (3) EIN's applied for by NNS or MDMS personnel (Laroque, Txxxxx or Axxxxx Fxxxxx) – not by the surgeons. Furthermore, after the LLCs are formed, NNS and/or MDMS caused the LLCs to, once again, use NNS' CPA Mxxxxxx Gxxxx to prepare the LLCs financial and tax information. *See* App. I, Tab A, item 3 at 1 & Tab B, item 3, at 1.[8] *See also* App. I, Tab A, item 1, Ex. 3.6 ¶ A & Tab B, item 2, Ex. 3.6 ¶ A. NNS and MDMS formed the LLCs ostensibly owned by the surgeons because, in reality, the LLCs formed by NNS for the surgeons are no more than extensions or conduits of NNS itself. In truth, the LLCs function as mere extensions of NNS and as conduits or empty "pipes" that NNS

---

[8] Sometime between June 2014 and March 2017, Ms. Gxxxxx relocated from Pxxxxxx & Gxxxx to firm of Rxxxxx Bxxxxxx, xxx Ixxx Road, San Antonio, Texas xxx16. *Compare* Ex. 7 *with* App. 1, Tab A, item 3 at 1.

uses to transact its scheme with the surgeons. The surgeon uses this LLC "pipe" to convey referrals of patients to NNS, and NNS used the LLC "pipe" to in turn pay kickbacks to the surgeon for the referrals. The scheme works as follows:

36.     That the surgeons' purported LLCs have no physical facilities or clinics to actually perform any neuromonitoring services during the surgeries is confirmed by the fact that the LLCs lack any street addressed or physical locations. Rather, the only address shown in, *e.g.,* National Provider Identifier databases for the LLCs, are private post office boxes at UPS Stores.[9]

37.     These LLCs also have no neuromonitoring facilities, equipment or technology of their own. *See, e.g.,* App. I, Tab A, item 6, Ex. 1 ¶¶ 2-3, 5 & Tab B, item 6, Ex. 1 ¶¶ 2-3, 5. The LLCs also have no bona fide employees of their own,[10] and the surgeons play no bona fide role in actually managing, operating, providing or supervising the neuromonitoring services ostensibly offered by their LLCs. Instead, when surgery for either a federal healthcare program

_____

[9] *Compare* Ex. 11 (showing exemplar LLC addresses as: xx08 xxxxx Street, Suite 1xx #170, Austin, Texas xxx01; xx31 Hxx. x North, Suite 1xx #194, Houston, Texas xxx84; xx07 S. Cxxxxxxxx Ave., Suite E #286, Austin, Texas xxx04; xxx70 Hxx. xxx North, Suite 1xx #206, San Antonio, Texas xxx58; xx70 Fxxxxxxxxxxxxx Rd., Suite xxx, #101, San Antonio, Texas xxxxx; xx Hxxxxxxx Pxxx Vxxxx, Suite 1xx #566, Dallas, Texas xxx05; xx48 Lxxxxx Avenue, Suite 1xx #318, Dallas, Texas xxx19; xx50 Lxxxxxxxxx Street, Suite 4xx #341, Houston, Texas xxx06; xx19 Rxxxxxxxx Drive, #xxx, Moore, Oklahoma xxx60; and xx18 Jxxxxxxxx Hxx., #xxx, Baton Rouge, Louisiana xxx09) *with* Ex. 12 (showing all addresses shown for surgeons' purported LLCs are actually UPS Stores).

[10] Relators have included in Appendix I the Cxxx Mxxxxxxxxx balance sheet as of December 31, 2016, prepared by Mxxxxxx Gxxxxx, who is or was NNS' CPA. *See* App. I, Tab A, item 3 at 1-2. As this balance sheet shows, Cxxx Mxxxxxxxxx had $xxxxxxxx in revenues and $xxxxxxxxx in members' equity in 2016. *Id.* Cxxx Mxxxxxxxxx also made LLC distributions of $xxxxxxxxxxx in 2016. *Id.* As compared to these relatively large amounts, the Cxxx Mxxxxxxxxx balance sheet shows payroll wages of only $xxxxxxxx and a credit of $xxxxxxxx for A/P Payroll Liability. *Id.* Viewed in light of Cxxx Mxxxxxxxxx's revenues, members equity and distributions, these payroll figures are so insignificant as to demonstrate that Cxxx Mxxxxxxxxx could not have itself employed the neuromonitoring technicians, monitoring physicians, staff, billing, collections and record-keeping personnel needed to operate the LLC as a bona fide neuromonitoring company or clinic. The other balance sheets included in Appendix I likewise show this disproportionate pairing of revenues, members' equity, and/or retained earnings to payroll wages or payroll liabilities. *See, e.g.,* App. I, Tab B, item 3 at 2. That the surgeons' purported LLCs have no employees of their own is also confirmed by NNS'/MD Management's statements in the "turn-key solution" letters attached in Appendix I. *See, e.g.,* App. I, Tab A, item 10 at 1 & Tab B, item 10 at 1.

**UNDER SEAL**

patient or privately insured patient is scheduled, the surgeon and/or his staff schedule the neuromonitoring services – ostensibly to be provided at the surgeon's purported LLC. But because the surgeon's purported LLC itself has no IONM equipment, technical personnel or IONM physicians, the LLC refers or "outsources" all the technical and clinical functions required for the neuromonitoring out to NNS. The LLC's referrals to NNS can be seen on a referrals database (which Relators can access) developed when Bxxxxxx acted as Simplicity's liaison with NNS.

38.     In this database example, the "client name" column indicates how NNS and Medical Diagnostics Management Services describe the entity for which NNS is performing the neuromonitoring service – in this example Cxxx Mxxxxxxxxx. App. I, Tab A, item 4; *see also* App. I, Tab B, item 4. In other words, Cxxx Mxxxxxxxxx is NNS' "client." The "Surgeon" column indicates the surgeon who refers, or causes his or her purported LLC to refer, the patient to NNS for the neuromonitoring service. *See id.* The "hospital" column indicates the hospital, medical center or facility where the surgeon actually performs the surgery. *Id.* Once NNS receives the referral from the surgeon, NNS then uses *its own* employees, equipment, facilities, technical personnel and remote physicians to actually provide the neuromonitoring services to the patient whom the surgeons – using the LLC as a conduit – referred to NNS.

39.     In addition to outsourcing all the technical and clinical aspects of providing the neuromonitoring service to NNS, the surgeons' purported LLCs also "outsource" all their material business functions to NNS. Accordingly, once the neuro-service is completed, the LLC likewise outsources the billing and collecting of fees to NNS, or to its in-house billing organization, Medical Diagnostic Management Services LLC (a company or NNS division using NNS' address. *See* Ex. 8.)

40.     The extent to which these surgeons purported LLCs completely abdicate on the functions that a bona fide, independent monitoring company would perform – and instead relinquish total responsibility for running their purported neuromonitoring businesses to NNS and MDMS – is illustrated in the form Management Services Agreement entered between NNS and the LLCs.   Relators attach an example of this form as used by Medical Diagnostics Management Services LLC (an NNS-controlled company, division or in-house "arm") and Cxxx Mxxxxxxxxx.   App. I, Tab A, item 6.   The Management Services Agreement identifies Medical Diagnostics Management Services as the "Manager" and Cxxx Mxxxxxxxxx as the purported "Provider." *Id.* at 1.   This Agreement was signed on June 12, 2014 by Scott Laroque, CNIM, as president of Medical Diagnostics Management Services LLC d/b/a MD Management Services LLC, and by Rxxxxxx Dxxxx, as managing member of Cxxx Mxxxxxxxxx.   *Id.* at 13.   Among other things, this form Agreement states:

> [T]he non-Medical Management, administrative and other services to be provided by Manager shall include … :
>
> 1. *Billing and Collections* … Manager, as agent for the Provider, shall be responsible for billing and collecting the charges made with respect to all Neuromonitoring Services provided by the Provider. …
> Manager shall perform the preparation, distribution and recording of all bills and statements for Neuromonitoring Services rendered by the Provider, including the billing and completion of reports and forms required by … governmental agencies … .
> ….
> The extent to which Manager attempts to collect such charges, the methods of collection and the amount of settlements … shall be within the sole discretion of the Manager.
> ….
>
> 3. *Equipment.*   Manager shall provide all equipment necessary to perform the Neuromonitoring Services. …
> ….
>
> 5. *Supplies.*   Manager is authorized to acquire and supply to the Provider all medical and non-medical supplies which may be reasonably required in connection with the provision of Neuromonitoring Services … .

....

7. *Bank Accounts, Cash Management.* Manager <u>shall establish and maintain</u> ... a Provider <u>Account</u> ... for and on behalf of the Provider for the deposit and disbursement of Provider's funds relating to the Neuromonitoring Services. ... All revenue for Neuromonitoring Services shall be deposited in the Provider account. <u>Manager is authorized to disburse funds from the Provider Account</u> for the payment of ... the [Manager's] Management fee and for all other costs ... and disbursements incurred in connection with this Agreement.

App. I, Tabs A, item 6, Ex. 1 (underscoring added). *See also* App. I, Tab B, item 6, Ex. 1. The Agreements for the other representative examples in Appendix I contain the same language. *See* App. I, Tabs C-J, item 6, Ex. 1 or A.

 41.  The Power of Attorney that the form Management Services Agreement grants to NNS' affiliate MDMS on behalf of Cxxxx Mxxxxxxxxxx is also quite expansive, stating:

> ... Cxxx Mxxxxxxxxx ... hereby appoints Medical Diagnostics Management Services LLC d/b/a MD Management Services ... as the agent or attorney-in-fact on behalf of the Provider to do all acts ... in any way pertaining to the following powers or subjects:
>
> (A)   Company Formation ... and Application for Employment Identification Number;
> (B)   To supervise and coordinate the billing, on behalf of Provider, of patients for all billable Neuromonitoring Services ...;
> (C)   To supervise and coordinate the billing, on behalf of Provider, of all claims for reimbursement ... from ... <u>Medicare, Medicaid</u> and all other third party payors ...;
> (D)   To ensure the collection and receipt, on Provider's behalf, of all accounts receivable generated by such billings and claims for reimbursement ...;
> (E)   To deposit all amounts collected on behalf of Provider for Neuromonitoring Services, into an account ...;
> (F)   To disburse such deposited funds ... on behalf of Provider ...;
> (G)   To take possession, endorse in the name of Provider, and deposit into the Provider Account any ... checks, money orders, insurance payments ... and any other instruments received in payment of accounts ...; and
> (H)   To sign checks, drafts, bank notes, other instruments on behalf of Provider, and to make withdrawals from the Provider Account for payments specified in the Management Services Agreement ... .

App. I, Tabs A-J, item 6, Ex. 3.6 or B (underscoring added).

42.     As part of NNS' completion of reports and forms required by governmental agencies for Cxxx Mxxxxxxxxx per the Management Services Agreement, NNS completed a National Provider Identifier number application for Cxxx Mxxxxxxxxxx.[11]   The application resulted in the Center for Medicare and Medicaid Services ("CMS") assigning NPI number xxxxxxx013 to Cxxx Mxxxxxxxxx on June 20, 2014.   App. I, Tab A, item 7.   Notably, the address associated with this National Provider Identifier is (once again) one of the addresses for NNS and/or Medical Diagnostics Management Services, *i.e.,* "xx02 Paesanos Pkwy, Ste. 100, Shavano Park, TX xxxxx-xxxx," *id.* – not the address for Cxxx Mxxxxxxxxx.   Also, CMS emailed the NPI assignment notice to Bxxxxx Txxxxx, NNS Director of Operations – not to Rxxxxxx Dxxxx, the surgeon who purportedly owns Cxxx Mxxxxxxxxx.

43.     Similarly, on December 18, 2015, CMS emailed notice that NPI number xxxxxxx381 was assigned to Mxxxxxxxx to Axxxxx Fxxxxx, whom Relators know to be an NNS employee. *See* App. I, Tab B, item 7.   Again, the address associated with the NPI is not the address for the LLC.   The address shown is instead that for the Hxxxxxx & Pxxxxx, *see* App. I, Tab B, item 1 & B item 7, which Relators have personal knowledge to be a firm frequently engaged by NNS.   Likewise, in the case of the other eight example LLCs contained in Appendix I, the NPI assignment notices were emailed to employees or agents of NNS, including Laroque (rather than to the surgeons or the LLCs purportedly owned by the surgeons).   *See* App. I, Tabs C-J, item 7.   Typically, the NPI assignment notice also lists NNS' address or the address of one of NNS' agents (rather than address for the LLC) for the number that CMS had assigned. *See id.*

---

[11]  This particular LLC is named "Cxxx Mxxxxxxxxxx PLLC" – thus giving any reasonable persons the impression that the LLC truly engaged in the neuromonitoring business.   But instead of actually operating and maintaining any neuromonitoring equipment, performing neuromonitoring services, submitting claims to Medicare, Medicaid or Tricare, collecting on the claims billed, negotiating with payers on any rejected or re-submitted claims, making distributions after all costs are covered, *etc.,* the surgeon's LLC simply outsources <u>all</u> those functions to the "turn-key solution" provided by NNS.

**UNDER SEAL**

44.     A National Provider Identifier is a unique ten-digit identification number issued to identify healthcare providers by CMS.   If an organization applies for enrollment in Medicare/Medicaid payment program, the organization must provide an NPI on the organization's enrollment application.   Otherwise, the application will be rejected.[12]  Further, providers "must enroll in the Medicare Program to be paid for covered services they furnish to Medicare beneficiaries."[13]  NNS' obtaining an NPI for Cxxx Monitoring, Mxxxxxxxx and the other LLC examples contained in Appendix I shows that NNS enrolled the LLCs in the Medicare/Medicaid program so that – per the powers granted it in the Management Service Agreement and Power of Attorney – NNS and its affiliate MDMS could bill insurance programs[14] for neuromonitoring services that the LLC purported to provide to patients.   As part of this enrollment, NNS completed for these LLCs CMS form CMS-855B or equivalent CMS forms.   This form admonishes applicants:   **"As a Medicare health supplier, you must obtain an NPI Prior to enrolling in Medicare ... ."**[15]  This form contains the following certification of compliance:

> I agree to abide by the Medicare laws ... .  I understand the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) ... .[16]

In other words, not only does NNS perform all material clinical and business tasks for the

---

[12] *See* Centers for Medicare & Medicaid Services, Medical Learning Network, No. 909434, NPI:  What You Need to Know at 2 (Dec. 2016) ("If you apply for enrollment ... you must have an NPI and furnish it on your enrollment application.  An enrollment application without an NPI will be rejected.")

[13] *See* Centers for Medicare & Medicaid Servs., MLN Booklet ICN 903768, Medicare Enrollment for Physicians, NPPs and Other Part B Suppliers at 3 (Dec. 2017).

[14] Private insurers require not only the provider's EIN number, but also its NPI number, when paying HIPPA standard claims or electronic claims.   *See, e.g.,* https://www.aetna.com/faqs-health-insurance/health-care-professionals-NPI-HIPAA-faqs.html.  Additionally, health care providers need an NPI so they can be identified on electronic transactions performed by other entities.  *Id.*

[15] Medicare Enrollment Application, Clinics/Group Practices and Certain Other Suppliers, CMS-855B at 1 (July 2011) (bold face original).

[16] *Id.* § 15(a)(3) at 31.

UNDER SEAL

LLCs, it also ensures that the LLCs certify compliance with federal law – so that NNS, through its billing arm MDMS, can bill insurers for the neuromonitoring services which the LLCs ostensibly provide, but which are in actuality provided by NNS.

45.     Like the LLCs, and as seen on the federal NPI registry administered by CMS, NNS also applied for and received an NPI number. Ex. 9. NNS then enrolled in Medicare with Form CMS-855B. That NNS completed this Form, and enrolled in Medicare, is shown by the fact that NNS is able to bill the federal healthcare programs, including Medicare, for neuromonitoring services. Representative examples of NNS billing such services to, *e.g.*, Medicare can be seen on screenshots provided from the NNS referrals database for the LLCs in Appendix I. *See* App. I, Tabs A-J, item 5. For example, the screenshot for Cxxxx Mxxxxxxxxx shows that that on claim id xxx387, NNS charged Medicare $54,226.00. App. I, Tab A(5). On claims, xxx983, xxx284 and xxx789, NNS charged Medicare $26,318.00, $90,345.00 and $33,383.00, respectively. App. I, Tab A, item 5. The screenshot for Mxxxxxxxx shows that on claim id xxx582, NNS charged Medicare $74,588.00. App. I, Tab B(5). On claims, xxx064, xxx903 and xxx905, NNS charged Medicare $67,428.00, $73,765.00 and $108,255.00, respectively. App. I, Tab B, item 5. Like examples abound in screenshots for the other eight LLCs included in Appendix I. *See* App. I, Tabs C-J, item 5. Data available to Relators from the NNS referrals database shows that, from 2011 through mid-January 2018, NNS and the LLCs have charged private and federal insurers $xxxxxxx on 86,803 claims. Ex. 5. Claims ultimately charged to the federal government constitute roughly 42% of this amount, or about $xxxxxxxx. *Id.*

46.     In addition, each of the involved surgeons likewise applied for and received an NPI number, *see, e.g.,* Ex. 9, so that the surgeons could enroll in Medicare using Form CMS-

855I, which contains the same certification of compliance as Form CMS-855B.[17]

47.    That the purported surgeon's LLCs are merely extensions of NNS is also shown in the way that NNS' billing arm Medical Diagnostics Management Service treats NNS' purported "clients" on the NNS referrals database. *See, e.g.,* App. I, Tab A, item 4.   A screenshot of a page from this database shows that a number of columns, including two headed "claim id" and "PID," which display unique patient and claim numbers. *Id.*  In a representative example, two successive rows show claim numbers for two different patients, xxx284 and xxx323. *Id.*  The "DOS" (date of service) shows xxxxx xx, 2017 as the date both the surgical procedures were provided. *Id.*  Thus, in these two rows, one can see that the surgeon did two procedures on the same day, at 7:45 and 10:58, respectively. *Id.*  The "Surgeon" column identifies the surgeon, Dr. Dxxxxx, who performed both surgeries. *Id.*  The "hospital" column shows the facility, Axxxx Axxxxx Medical Center, where the doctor performed both surgeries. *Id.*

48.    Hence, the NNS referrals database shows that Dr. Dxxxx performed surgeries on two different patients, approximately one to two hours apart, on exactly the same day at Axxxx Axxxxxx Medical Center.  Given the proximity in time and same location for these surgeries and neuromonitoring services, it is obvious that NNS – using its own equipment, personnel, technologists and monitoring physicians – provided the neuromonitoring services for Dr. Dxxxxx's surgeries on *both* patients.  The kicker, however, is the difference in the two rows resulting only from the *insurance type*.  As shown in the "insurance type" and "client name" columns, MDMS lists "National Neuromonitoring Services" as the purported "client" on whose behalf MDMS billed the neuromonitoring service when the patient was covered by "Medicare."

---

[17]   Medicare Enrollment Application, Physicians and Non-Physician Practitioners, CMS-855I § 15(4) at 25 (July 2011).

In contrast, MDMS lists Cxxx Mxxxxxxxx as the "client" on whose behalf MDMS billed the neuromonitoring service when the patient was covered by "Private Insurance."

49.     Such record keeping is a sham. In reality, "National Neuromonitoring Services" (NNS) and Cxxx Mxxxxxxxxx are one-and-the-same. The Cxxx Mxxxxxxxxx LLC simply serves as an extension and conduit for NNS. The neuromonitoring services for both the surgeon's patients were provided by the *same* entity (NNS), by the *same* technicians and monitoring physician, for the *same* surgeon, using the *same* NNS equipment, on the *same* day, at (nearly) the *same* time, at the *same* facility and for the *same* "client," *i.e.,* NNS and its sham company extension, Cxxx Mxxxxxxxxx – which NNS controls and uses as a conduit, but which the surgeon purportedly owns. The only difference is what company name is used for billing.

50.     The same types of representative examples are found on this screenshot for Cxxx Mxxxxxxxxx for, *e.g.,* claim number pairs xxx579 and xxx789, xxx371 and xxx353, and xxx786 and xxx153. App. I, Tab A. item 5. The same types of representative examples are likewise shown on a screenshot for Mxxxxxxxx for, *e.g.,* claim number pair xxx913 and xxx064. App. I, Tab B, item 5. Other representative examples can be seen in pairs of claim numbers shown on the screenshots for another eight LLCs set out in Appendix I incorporated into this Complaint. *See* App. I, Tabs C-J, item 5.

51.     Additionally, in attempts to avoid arousing suspicion, NNS and MDMS often list "alias" companies on bills submitted to the federal government to create the appearance that – instead of flowing entirely to NNS – the roughly $xxxxxxxxxxx that NNS caused to be billed to the government was instead billed by "different companies." Again, NNS' and MDMS' record keeping and corporate organization are a sham. The purportedly "different" limited liability companies appearing on bills generated by MDMS are, in reality, mere extensions of NNS or

sham companies controlled by NNS, Laroque and/or Kosova. NNS uses these "alias" companies to route the massive billings collected from the federal government back to NNS, Laroque and/or Kosova – while making it appear that companies *different from* NNS are responsible for the xxxxxxxxxxxx in neuromonitoring bills that NNS caused to be presented to the government. As employed by NNS, these purportedly "different" LLCs are not truly separate companies. Rather, they are little more than phony names that NNS and MDMS use to disguise the fact that roughly $xxxxxxx in government billings flowed back to, and were ultimately received by, NNS, Laroque and Kosova.

52.     These alias or phony name LLCs are listed on Ex. 1.[18]

**2.      NNS' attempts to disguise kickbacks for referrals of patients in federal healthcare programs by purporting to pay the surgeon's 62% share only from fees collected from private insurers**

53.     As shown on the April 10, 2017 and May 8, 2017 monthly reports that MDMS generated for Cxxxx Mxxxxxxxxx, once claims are paid by insurers or federal healthcare program, NNS' collections arm deducts at least 30% of amounts collected from the private (*i.e.,* non-governmental) insurers – though ostensibly *not* from amounts collected from federal healthcare programs. *See* App. I, Tabs A, item 8a at 3 & A, item 8b at 3. *See also* Tab B, item 8a at 2 & B, item 8b at 2 (Mxxxxxxxx monthly reports of 10/11/17 & 9/11/17); App. 1, Tabs C – J, item 8a & 8b (dated monthly distribution statements for two months for eight additional LLC examples in Appendix I). NNS falsely labels this 30% as a "management fee," *see, e.g.,* App. I,

---

[18] In addition, MDMS uses alias or phony name billing companies for the same reason. These companies or LLCs include, *e.g.,* Acquisition Billing Services, Acquisition Billing Services – DFW, Colorado Center of Neurological Services (CCNS), Dr. Krane LLC, H & PCS, Inc. and the Pain and Rehab Institute. Ex. 2.

Tab A, item 6 § 3.1; Tabs A, item 8a at 3 & A, item 8b at 3[19] – instead of as an outright compensation to NNS for actually providing the neuromonitoring services that the LLC purports to deliver (but which have in reality been outsourced to NNS by its conduit, the surgeon's purported LLC). The dated monthly reports also show that NNS, or its in-house billing/collections arm MDMS, takes another 8% of the fees collected as a "billing fee." *See* App. I, Tabs A, item 8a at 3 & A, item 8b at 3. *See also* Tabs B, item 8a at 2 & B, item 8b at 2 (Mxxxxxxxx monthly reports of 10/11/17 & 9/11/17); App. 1, Tabs C – J, items 8a & 8b (dated reports in two months for eight additional LLC examples included in Appendix I). Again, this deduction is made ostensibly only from the collections from private insurers. And again, this "billing fee" is actually compensation to NNS or MDMS for performing the billing/collection functions that a legitimate, non-sham, non-conduit LLC would itself perform.

54. As shown by a December 10, 2017 Distribution Statement for Cxxxx Mxxxxxxxxx, NNS then pays a whopping 62% of the collections from the private insurers to the surgeon's LLC. App. I, Tab A, item 10 at 1 ("We collected a total of $144,542.77, so your net distribution will be $89,191.44"). *See also, e.g.,* App. I, Tab C, item 1 at 1 ("We collected a total of $53,413.47, so your net distribution will be $33,109.77 and ... arrive on 12/15/17."); *see also* App. I, Tabs D-J, item 10.

55. The LLC then completes NNS' kickback to the surgeon by paying the surgeon purported "distributions" from the LLC – when the LLC is actually just an extension of NNS. For example, bank account statements showing Cxxx Mxxxxxxxxx as the purported holder of the account, are actually instead addressed to NNS' office at 3502 Paesanos Parkway, Suite 100, Shavano Park, Texas 78231, show total withdrawal debits of $493,767.83 in favor of the surgeon

---

[19] *See also* App. I, Tab B, item 6 §3.01, Tab B, item 8a at 2 & Tab B, item 8b at 2; App. 1, Tabs C – J, items 6, 8a & 8b.

on March 10, 2017 and $113,269.83 on April 11, 2017. App. I, Tab A, item 9a & Tab A, item 9b. *See also* App. I, Tab B, item 9a & Tab B, item 9b (showing Mxxxxxxxx address at xx41 x. xxxx 1604 x 105-612 and showing surgeon withdrawal debits of $3,142.20 on August 10, 2017 and $16,602.54 on September 11, 2017). *See also* App. I, Tabs C-J, items 9a & 9b (bank accounts statements showing the account holders address to be – not the LLC's address – but instead a NNS or MDMS address, such as 3502 Paesanos Pkwy, Ste. 100, Shavano Park, Texas 78231; 1141 North Loop 1604 E. 105-612, San Antonio, Texas 78232; or P.O. Box xxx442, San Antonio, Texas 78259; also showing dates and amounts of withdrawals in favor of surgeons to effect kickbacks).

56.     In this way, the surgeon keeps approximately 62% of the fees collected from private insurers, with NNS keeping 38% as its "cut" from those collections – even though it performed all of the neuromonitoring services, billing, collecting, working of claims, *etc.,* for the LLC.

57.     The Management Services Agreement between NNS' billing arm MDMS and LLCs like Cxxx Mxxxxxxxxx and Mxxxxxxxx gives MDMS the right to collect a purported "Management Fee" for itself and NNS of "Thirty percent (30%) of the Net Revenue received" by the LLC, and authorizes "the Manager to make withdrawals of the Management Fee from the bank account" that MDMS opened for the LLC to be assured of payment. App. I, Tab. A, item 6 §§ 3.1, 3.3; *id.* Tab B, item 6 §§ 3.1, 3.3. The Management Services Agreement that NNS uses with the LLCs are of a common form; representative examples are included in Appendix I. *See* App. I, Tab. C-J, item 6, §§ 3.1, 3.3. Notably, the Management Fee paragraph set out in the form Management Services Agreement for the LLCs *does not* limit the source of the revenues from which the purported Management Fee can be deducted. Specifically, the relevant part of the

Agreements does not state that NNS or MDMS can only take its Management Fee from revenues attributable to private insurer billings, as opposed to revenues attributable to federal healthcare programs.

58.     Nevertheless, as shown by the monthly reports for Cxxx Mxxxxxxxxx, Mxxxxxxxx and other representative examples included in Appendix I, NNS' billing arm MDMS purports to deduct the 30% Management Fee (and its 8% billing fee) *only* from the fees collected from *private* insurers – and not from fees collected from federal healthcare programs. *See* App. I, Tab A, item 8a at 8, Tab A, item 8b at 3; App. I, Tab B, item 8a at 2, Tab B, item 8b at 2. *See also* App. I, Tabs C-J, item 8a at 2-3, item 8b at 2-3. NNS' purporting to take its 38% "cut" only from the private insurer fees – and funneling the remaining 62% to the surgeon through the conduit LLC – is intended to further insulate NNS' sham structure from discovery. NNS intends this "fig leaf" to allow NNS to argue that it pays no money to induce surgeons to make referrals of *federal* healthcare program patients to NNS. NNS thereby hopes to evade claims that it violates federal law by paying kickbacks (through the LLCs) to obtain referrals of patients covered by Medicare, Medicaid, Tricare, etc.

59.     NNS' scheme places form over substance. The 62% "cut" that NNS kicks back to the surgeons through the LLCs, purportedly taken only from the private insurer fees, is a very "rich" allocation to the surgeons. Data in Relators' possession show that fees from private insurers constitute roughly 58% of the total fees that NNS has collected from 2011 to January 19, 2018. The fees collected from private insurers since 2011 total $xxxxxxxx. 62% of this $xxxxxxxx equals more than $xxxxxxxx – a staggering sum to be distributed among the surgeons involved in NNS' scheme. Even if one assumed that only half this amount were paid to the surgeons, kickbacks would still total nearly $xxxxxxx.

60.     NNS uses this generous 62% cut from the private insurers to induce the surgeons to refer, not only their privately-insured patients, but *all* their patients – including those covered by federal healthcare plans – to NNS for neuromonitoring services.  The purported origin of the funds that NNS uses to remunerate the surgeons in return for the referrals is irrelevant; the scheme violates federal law.  In other words, it does not matter if NNS induces the surgeon's referrals of all of his patients requiring neuromonitoring – including federal program patients – by (1) paying the surgeon, *e.g.*, 31% of the fees collected for privately-insured patients, plus 31% of the fees collected from federal healthcare program patients, or (2) simply by paying the surgeons 62% of the fees collected from privately-insured patients.  Either way, the effect is the same:  NNS gets the referrals of federal healthcare program patients by paying off the surgeons. The economic reality is that NNS is still paying kickbacks to the surgeons to induce referrals of patients enrolled in federal healthcare programs.

61.     That NNS and MDMS keep track of the number of federal healthcare program patient referrals made to NNS by the surgeons – and expressly conditions payment of the kickbacks on the surgeons' referring *all* their patients, *i.e.,* federal healthcare program patients in addition to privately-insured patients to NNS – is shown in monthly distribution reports that MDMS sends the surgeons.  Relators are in possession of these reports for the involved surgeons from 2013 to January 1, 2018.  Relators refer to two representative examples here:  On April 10, 2017 and May 8, 2017, MDMS sent Dr. Dxxxx "a company report" for Cxxx Mxxxxxxxxx with "supporting and additional details ... in the attached files."  *See* App. I, Tab A, item 8a at 1, item 8b at 1.  On the monthly "Company Profile" page, this report contains a row on the "All

Insurance Type – Total Case Activity" table expressly stating the number of "Federal/State"[20] patients that the surgeon referred to NNS on a monthly, quarterly and yearly basis. App. I, Tab A, item 8a at 3, item 8b at 3. This report also sets out a bar chart for "Federal/State Insurance" referrals in a set of bar charts titled "Payor Mix for the YTD." *Id.*

62. Similarly, on September 11, 2017 and October 11, 2017, MDMS sent the surgeon who purportedly owns Mxxxxxxxx "a monthly report" for this LLC with "a granular breakdown of monthly result." *See* App. I, Tab B, item 8a at 1, item 8b at 1. Again, on the monthly "Company Profile" page, this report contains a row on the "All Insurance Type – Total Case Activity" table expressly stating the number of "Federal/State" patients that the surgeon referred to NNS on a monthly, quarterly, and yearly basis. App. I, Tab B, item 8a at 3, item 8b at 3. This report also sets out a bar chart for "Federal/State Insurance" referrals in a set of bar charts – expressly including a chart for "Federal/State Insurance." *Id.* Representative reports for another eight LLC examples are included in the attached Appendix I. *See* App. I, Tabs C-J, item 8a at 2-3, item 8b at 2-3.

63. NNS' and MDMS' actions and records speak for themselves. There would be no need for MDMS to monthly track and communicate to the surgeon the number of non-private insurer patients referred to NNS if the federal healthcare program patients were not part of the NNS' kickback "deal" with the surgeons.

**3. Presentment of claims to the federal government for payment**

64. The NNS referrals database that Relators can access with the Simplicity system also contains precise records of NNS and its billing arm MDMS presenting for payment claims to the federal government for the neuromonitoring services rendered to federal healthcare

---

[20]   State patients are Medicaid patients. The Medicaid program is jointly funded by the federal government and the states.

program patients. For example, a screenshot from the NNS referrals database shows columns of information for Cxxx Mxxxxxxxxx in columns headed, *e.g.,* "claim id," "PID" (*i.e.,* the internal patient ID number), "client name," "DOS/T" (the date and time of service), "Surgeon," "hospital," "insurance type" (identifying the insurance entity that NNS or its billing arm MDMS charged for the neuromonitoring services) and "ins charged" (showing the amount billed to the payor, or charges presented for payment). App. I, Tab A, item 5. Evident from this representative example screenshot is that at least 13 patients on this page were insured by Medicare, including, *e.g.,* patients with claim Nos. xxx387, 804893 and xxx789. *See* App. I, Tab A, item 5, claim id and insurance type columns. Also evident from this representative example is that NNS itself, and through its billing arm MDMS, presented charges or claims to the Medicare program for the neuromonitoring services rendered to these 13 patients.[21] For example, NNS and MDMS charged to Medicare the amounts of $54,226.00, $26,318.00 and $33,483.00, respectively, for patients with claim Nos. xxx387, xxx893 and xxx789.

65. The same facts ring true for Mxxxxxxxx screenshot. *See* App. I, Tab B, item 5. Again, evident from the referrals database is that at least six patients visible on the page were covered by Medicare. *See* App. I, Tab B, item 5, insurance type column. These patients include, *e.g.,* those with claim Nos. xxx582, xxx064, and xxx903. *See* App. Tab B, item 5, claim id and insurance type columns. The referrals database shows that NNS or MDMS billed Medicare in the amount of $74,588.00, $67,428.00 and $73,765.00, respectively, for the neuromonitoring services provided to these three patients. *Id.,* ins charged column. The screenshots for Cxxx Mxxxxxxxxx and Mxxxxxxxx – and the screenshots included in Appendix I for another eight

---

[21] As the result of NNS hiring Simplicity to develop the NNS software system, Relators have knowledge that the "ins charged" column shows the amounts that NNS, or its billing arm MDMS, charged and presented for payment to insurers (including federal healthcare programs) for neuromonitoring services rendered to the patients identified by the claim id's and PID's on the same row of the table.

**UNDER SEAL**

LLCs – abound with like representative examples of NNS and billing arm MDMS making and presenting claims or charges for payment to the federal government for the neuromonitoring services rendered to the LLCs' purported patients. *See* App. I, Tabs A-J, item 5, ins charged column.

66.     Obviously, NNS and MDMS would not record and track this information in the referrals database had they not presented the claims to, *e.g.,* Medicare, Medicaid, Tricare or other federal programs for payment on the neuromonitoring services. The same is true, not only for examples detailed and included in Appendix I, but also for all 193 LLCs included in the NNS referrals database. *See* App. II.

### 4.     The surgeons collect large monthly payments for essentially doing nothing – except making referrals to NNS

67.     At bottom, the surgeons and their LLCs play no genuine or bona fide role in the LLCs' purportedly (1) employing technical staff responsible for situating, maintaining and operating neuromonitoring equipment, (2) monitoring data and signals generated by neuromonitoring sensors during surgeries (which function is handled by physicians employed by NNS at remote locations), (3) submitting claims to insurers for neuromonitoring services ostensibly provided by the LLC – but actually provided by NNS, (4) negotiating with insurers, Medicare, Medicaid, Tricare or other federal healthcare program on the status of disputed, unpaid or outstanding claims, (5) collecting fees for the claims submitted to insurers, Medicare, Medicaid, Tricare or other federal healthcare programs, (6) determining which claims should be released or deemed uncollectable, and (7) making monetary distributions to NNS and/or to the surgeons' purported LLCs after (8) accounting for purported management or billing fees charged to the LLCs. Rather, the LLCs purport to "outsource" all these functions to NNS, which performs them for the LLCs because the LLCs are shams, and merely function as conduits or

33

extensions of NNS.

68. Tellingly, a December 10, 2017 form letter that NNS' billing arm Medical Diagnostic Management Services sent to Dr. Dxxxxx euphemistically referred to the sham, conduit nature of LLC's relationship with NNS as a "turn-key solution" or "comprehensive solution" for the surgeon. This letter stated:

> We're very pleased to provide you with your customary monthly report, which includes your Distribution Statement for November 2017 … .
>
> We are elated to report that your company had a banner month. We collected a total of $144,542.77, so your net distribution will be $89,191.44 … . Our billing team released 3 claims during the month, but … additional collections are anticipated to accrue within 60 days of claim submittal. We'll be sure to keep you posted if there are any changes in the status of outstanding claims. …
>
> This month's distribution is illustrative of a very strong and lucrative partnership between National Neuromonitoring and your company. It's also reflective of our commitment to offer a turn-key solution, from providing highly-qualified technologists, to having cases monitored by remote physicians, to our unique ability to handle billing and claims submittal, collections, and timely distributions [for the LLC]. Nowhere in the … industry will you find such a comprehensive solution. …

App. I, Tab A, item 10 at 1.

69. A November 2017 letter to the named surgeon at Mxxxxxxxxx contains like "turn-key" language, App. I, Tab B, item 10 at 1, as do the same representative example letters included in Appendix I for eight other example LLCs. *See* App. I, Tabs C-J, item 10 at 1. In these circumstances, the term "turn-key solution" and "comprehensive solution" are euphemisms for the surgeons' making referrals of federal program patients to NNS for neuromonitoring services – in return for kickbacks falsely labeled as "distributions" received from an empty-shell LLC in which the surgeon owns an equity position. The LLCs serve no legitimate or independent business function. Instead, they function merely as empty pipes or extensions of NNS, through which the surgeons make referrals of their patients to NNS for neuromonitoring

services, and back through which NNS pays the surgeons kickbacks in the guise of making LLC "distributions."

70. With such disbursements made from bank accounts that NNS and its billing arm MDMS control, the loop of the surgeon's making referrals through a conduit LLC to NNS, and NNS then paying kickbacks back through the LLC to the surgeon, is complete. As a result of this scheme, surgeons can receive kickbacks of well in excess than $100,000 in a single month from NNS. *See, e.g.,* App. I, Tab A, item 9a. The involved surgeons can thus collect large payments each month for doing nothing – except referring Medicare, Medicaid, Tricare or other federal healthcare patients to NNS. NNS and/or MDMS transfer these monetary payments to the surgeons for "free" and/or without the surgeons having provided to NNS or to the LLCs any services or items of sufficient fair market value to warrant the payments to the surgeons.

71. The NNS scheme is thus very financially advantageous to the involved surgeons and serves to actually induce them to refer patients to NNS for neuromonitoring services – instead of to other neuromonitoring companies. The scheme is also advantageous to NNS. Due to the generous 62% "cut" or kickback that the surgeon receives on the collections from private insurance, NNS has been able to recruit at least 193 LLCs owned by surgeons into its scheme. This generous percentage paid to the surgeons has helped NNS to outpace its competition in recruiting neuromonitoring patients – expressly including patients covered by federal healthcare programs – to NNS. NNS more than makes up the payments to surgeons by the increase in volume of fees it collects for the referred patients.

**I.** **Harm to the government – increased use of objectively unnecessary neuromonitoring services which are billed to the government**

72. The Stark law and/or the AKS on which the FCA claims are predicated "prohibit the government from paying *any* amount of money for claims submitted in violation of the law."

Compliance with the Stark law and AKS "is a condition precedent to reimbursement of claims submitted to," *e.g.,* Medicare. Because NNS and MDMS violated these laws, "the government owed [them] nothing."

73. In other words, *all* collections that NNS and MDMS have made from the government by using the scheme constitute actual damages to the government. If the collection rate on $xxxxxxxx in billings was, *e.g.,* only 50%, then damages would still total $xxxxxxxxx.

74. Also, the decision to use a neuromonitoring service is discretionary with the surgeon. However, once surgeon's at the LLCs involved in the NNS scheme learned that they could collect 62% of the revenues attributable to private insurers for referring to NNS both their privately-insured patients and patients covered by federal healthcare programs, the surgeons' discretion was influenced. Given the economic incentive presented by the NNS scheme to employ neuromonitoring services – regardless of whether the service was truly necessary – the involved surgeons began to overuse neuromonitoring services to reap the "rich" 62% private-insurance allocation that NNS gave to them as a kickback.

75. As a result of their access to the NNS database, Relators can compare the 2013, or pre-scheme, federal healthcare program claims that NNS made to the federal healthcare program to claims that NNS made as of the conclusion of 2017. In 2013, federal healthcare program claims represented 24% of NNS total charges for neuromonitoring services. By 2017, however, federal healthcare program claims had grown to whopping 55% of NNS' total charges. This growth in federal claims is illustrated in Ex. 10, which Relators have prepared. Moreover, the volume of federal healthcare program claims made by NNS grew from 2,441 in 2013 to 15,216 filed in 2017. Again, this growth in federal claims is illustrated in Ex. 10, which Relators prepared.

76.     Disturbingly, this growth in the total number of federal healthcare program claims made by NNS was accompanied by an extraordinary growth in the average charge per federal healthcare program claim.   For example, in 2013, the average charge per claim was $38,177/claim.  By 2017, the average charge for a federal claim had grown to $90,738/claim. This growth in charges-per-claim is also illustrated in Ex. 10, which Relators prepared.  NNS' business would not have experienced this astonishing growth of an additional 12,819 claims per year (2013 versus 2017), and an increase in average charges per claim of $52,606 (2013 versus 2017) had NNS not recruited the surgeons into its kickback scheme.  As these numbers indicate, the but-for cause of these increases was the financial incentive that the kickback scheme gave to surgeons to refer federal healthcare program patients to NNS for neuromonitoring services which were not needed or required for the surgeons to perform the surgeries.

77.     Even if one (1) limits the government damages model to 2017 only – and excludes all other years, *e.g.,* 2013 through 2016 – and (2) assumes that only 10% of the amounts that NNS charged the federal government in 2017 were for procedures where neuromonitoring was objectively unnecessary, the damage to the government is .10 x $xxxxxxxxx, or $xxxxxxxx. If one assumes that 20% of the 2017 amounts that NNS charged the federal government in 2017 were for procedures where neuromonitoring was unnecessary, damages to the government would then be about $xxxxx.  At 30%, the damages number becomes $xxxxxxx, and so forth.  The harm to the government is that the government pays for neuromonitoring services which the surgeons would not have requested or used – but for NNS' kickback scheme.

78.     Alternatively and/or in addition, if NNS contends (1) that the 38% "cut" of revenues on privately-insured patients which NNS and MDMS charge the LLCs for performing all material business and clinical functions of a bona fide neuromonitoring provider is in fact the

fair market value of those services, and (2) that the 62% of revenues that the LLC receives on privately-insured patients is *not* a kickback, then the government's damages are again clear. The NNS database shows that average amounts that MDMS bills for neuromonitoring services do not vary materially as between privately-insured patient claims and federal healthcare program patient claims. Accordingly, if 38% of revenues is the "fair market value" for performing *all* the business and clinical functions that a neuromonitoring lab or clinic would perform in the case of *privately-insured* patients, then 38% should also be the fair market value of performing exactly the same services in the case of *federal healthcare program* patients. The fact that NNS and MDMS have kept 100% of revenues in the case of federal healthcare program patients means that the Defendants have overcharged the government by a metric of 62%.

79.     The NNS database shows that from 2011 to January 2018, NNS and MDMS have billed the government or its agencies roughly $xxxxxxxx on about 31,861 claims. 62% of $xxxxxxx is $xxxxxxxx. Hence, the government's damages would be in excess of $xxxxxxxx.

## IV.     Causes of action

80.     Relators reserve and invoke the right to plead in the alternative. Each paragraph of this Complaint is incorporated into all other paragraphs of this Complaint.

81.     This scheme took place over a period of at least four (4) years and is currently ongoing. NNS and MDMS have made false and improper claims for payment or reimbursement to Medicaid, Medicare, Tricare or other federal healthcare programs using the LLCs as part of an unlawful scheme. Due to the multi-year timeframe of NNS' scheme, and the fact that the scheme involves at least 193 LLCs and 53 NNS affiliated entities, Relators cannot detail here all precise acts constituting NNS' violations of the FCA, AKS and Stark Law without causing this Complaint to run into the hundreds of pages (if not the hundreds of pounds). Accordingly,

Relators provide particular, specific and representative examples or samples of fraudulent acts committed pursuant to NNS' scheme in Appendix I. This pleading and representative examples or samples in the Appendices and exhibits hereto set out with particularity the who, what, when, where and how of NNS' fraudulent scheme. As a result of their membership in Simplicity, Relators possess data, information and direct and independent knowledge allowing them to plead NNS' violations of the FCA, Stark law and AKS for all LLCs listed in Appendix II with the particular and specificity required under Rules 12(b)(6) and 9(b).

### A. Operation of LLCs as a mere tool or conduit, single business enterprise and/or sham to perpetrate a fraud

82. The LLCs established by NNS for the surgeons, as well as the affiliates that NNS and MDMS use for billing or as aliases or phony names, are alter egos, conduits or sham extensions of NNS and/or MDMS. The LLCs also act as a single business enterprise with NNS and/or MDMS. There is such unity between NNS and/or MDMS and the LLCs that the separateness of the two has ceased, and the LLCs and affiliates function as NNS' and/or MDMS' agents, extensions or puppets. Holding only the surgeons or their LLCs or the affiliates liable would be unjust. The surgeons LLCs formed by NNS and/or the affiliates have no truly separate offices, employees, accounting, billing, collecting or distribution-making staffs, claim-negotiating personnel, neuromonitoring equipment and facilities, technical staffs or monitoring physicians. Rather, these LLCs and/or affiliates used NNS' and/or MDMS' offices, personnel, facilities, equipment, physicians, *etc.* NNS and/or MDMS or their internal companies' divisions effected the payment of wages to persons who purported to perform neuromonitoring services and business functions for the LLCs and/or affiliates – but who were actually performing those services and functions at the direction of NNS and/or MDMS. NNS' and/or MDMS' employees or its internal companies' employees rendered neuromonitoring services or business functions

for the LLCs. To assure that the LLCs and/or affiliates would have sufficient capital to pay the surgeons for making patient referrals to NNS and/or MDMS (using the LLCs as a conduit), NNS and/or MDMS made transfers of funds or capital to the LLCs and/or affiliates which were not properly documented or described. In reality, transfers from NNS and/or MDMS or their internal companies to the LLCs were made to effect the surgeons' and NNS' unlawful payment-for-referrals agreement. As a consequence of these actions, the unclear allocation of true profits and losses as between NNS and/or MDMS and the surgeons' purported LLCs and/or affiliates has resulted.

83.     The corporate forms of LLCs and/or affiliates were used for an improper purpose, *i.e.,* committing violations of the AKS, Stark Law and FCA for the benefit of NNS and/or MDMS. NNS and/or MDMS, through the LLCs, acted with a dishonesty of purpose or an intent to deceive.

84.     The form of the LLCs and/or affiliates was used as a means of perpetrating a fraud, including violations of the FCA, AKS and Stark Law. The LLCs and/or affiliates were organized and operated as a tool or business conduit of NNS and/or MDMS. NNS and/or MDMS used the LLCs and/or affiliates to evade existing legal obligations, including the obligation to refrain from committing fraud or violating the FCA, Stark Law and/or AKS. NNS and/or MDMS used the LLCs and/or affiliates to circumvent the FCA, AKS and Stark Law. NNS and/or MDMS also used and relied upon the LLCs and/or affiliates as a means of protecting, disguising or camouflaging its wrongdoing in paying the surgeons for referral of patients who required reimbursable neuromonitoring services to NNS and/or MDMS. Without transfers or payments from NNS and/or MDMS to effect the payment-for-referral scheme, the LLCs and/or affiliates would have been unable to make distributions to the surgeons.

Accordingly, the LLCs and/or affiliates were inadequately capitalized with the effect of creating an injustice.

## B.    Violations of the Anti-Kickback Statute

85.    The federal government conditions payment of claims made to Medicaid, Medicare, Tricare and/or other federal healthcare programs on the claimant's certification of compliance with applicable federal law, including the AKS and the Stark Law.  NNS and/or MDMS, individually and through the LLCs which serve as their conduits, falsely certified compliance on a number of different forms, including their CMS provider agreements and/or Medicare enrollment application Form CMS-855B.[22]  The involved surgeons also certified compliance with Form CMS-855I.

86.    With knowledge that they, the LLCs and the involved surgeons had falsely certified compliance, NNS and/or MDMS knowingly and willfully offered to pay and/or paid remuneration to surgeons, directly or indirectly, in the form of kickbacks disguised as LLC distributions or dividends to the involved surgeons.  NNS and/or MDMS induced and/or intended to induce the surgeons, using the conduit LLCs, to refer patients to NNS for the furnishing of neuromonitoring services for which payment was made in whole or part under a federal healthcare program.  NNS and/or MDMS transferred monetary payments to the surgeons for "free" and/or without the surgeons having provided to NNS or to the LLCs any services or items of sufficient fair market value to warrant NNS' and/or MDMS' payments to the surgeons. NNS and/or MDMS violated the AKS, including but not limited to 42 U.S.C. § 1320a-7b(b)(1), -

---

[22]  All the attached Appendices and Exhibits, and all information, facts and data therein relating to or showing persons' or entities' identities, topics or subject matters, transactions, dates or timeframes, physical locations, contents of documents or records, and/or the methods, practices or actions employed by NNS, MDMS, the involved surgeons or physicians or the LLCs purportedly owned by the surgeons, or by any person or entity, are incorporated into this Complaint and into each of its paragraphs as if fully set out herein.

**UNDER SEAL**

7b(b)(2). No safe harbors or statutory exceptions under the AKS applied or apply to the payments, or offers to pay, that NNS and/or MDMS made to the surgeons.

### C.     Violations of the Stark Law

87.     As a the result of the "turnkey" or "comprehensive" solution effected by NNS and/or MDMS – NNS and/or MDMS submitted claims to federal healthcare programs, including Medicaid and Medicare, when the services forming the basis of those claims were furnished pursuant to referrals from a surgeon or physician with whom NNS and/or MDMS had a financial relationship. Both NNS and/or MDMS and the involved surgeons or physicians acted knowingly. The services at issue were designated health services within the meaning of 42 U.S.C. § 1395nn(h)(6). These actions violated the Stark Law, 42 U.S.C. § 1395nn. No safe harbors or statutory exceptions under the Stark Law applied or apply to the claims NNS and/or MDMS submitted.

### D.     Violations of the False Claims Act

88.     As set out above, NNS and/or MDMS knowingly made false statements or engaged in a fraudulent course of conduct, which NNS and/or MDMS carried out with the requisite scienter, that was material and that caused the government to pay out money or forfeit money. NNS and/or MDMS made or presented claims to the United States government that were false or fraudulent while knowing the claims were false or fraudulent and seeking approval and/or payment from the federal Treasury. NNS and/or MDMS knowingly assisted in causing the government to pay claims grounded in a fraud. NNS and/or MDMS violated the FCA, 31 U.S.C. § 3729(a).

89.     Relators have direct and independent knowledge of 23,567 claims shown on the NNS referrals database made the subject of this action. On behalf of United States, Relators are

entitled to recover civil penalties of not less than $10,781 and not more than $21,916 per false claim, plus three times the amount of damages that the government sustains or sustained due to NNS' and/or MDMS' misconduct. 31 U.S.C. § 3729(a)(1). In addition, Relators are entitled to recover, on behalf of the government, their attorneys' fees, costs and expenses. 31 U.S.C. § 3730(d).

## V.   Prayer for relief

90.    Relators pray that the Court enter judgment against NNS and MDMS, and award Relators, on behalf of the federal government, civil penalties against NNS and MDMS as prescribed under the False Claims Act, three times the government's damages and/or three times the amount of the kickbacks, costs, expenses, attorneys' fees and pre and post-judgment interest as allowed by law. Relators respectfully pray for all other relief properly awardable at law or in equity.

Respectfully submitted,

STRAWN PICKENS L.L.P.

By:   /s/ John R. Strawn, Jr.
       John R. Strawn, Jr., No. 19374100
       Andrew L. Pickens, No. 15971900
       Pennzoil Place, South Tower
       711 Louisiana, Suite 1850
       Houston, Texas 77002
       (713) 659-9600
       (713) 659-9601 (Fax)
       jstrawn@strawnpickens.com
       apickens@strawnpickens.com
Attorneys for Realtors J. Michael Artigue and Chad Zerangue

## CERTIFICATE OF SERVICE

I hereby certify that service has been provided to the following recipients in accordance with Fed. R. Civ. P. 5(b) on this 18th day of September 2019.

Attorney General William Barr
Michael Granston, Director of Civil Fraud Section
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

United States Attorney Ryan Patrick
Attention:  Andrew Bobb, Ken Shaitelman
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, Texas 77002

/s/ *John R. Strawn, Jr.*